**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| Plaintiff, | **Case NO. 10 CR 645** |
| v. | **Hon. Harry D. Leinenweber** |
| **MICHAEL DORSEY,** | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant Michael Dorsey's ("Dorsey" or "Defendant") Motion to Suppress. For the reasons that follow, the motion is denied.

**I. BACKGROUND**

Dorsey is charged with unlawful possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). Dorsey seeks to suppress the weapon, a .25 caliber semiautomatic pistol, arguing that he was unlawfully seized and searched in violation of the Fourth Amendment. Dorsey also moves to suppress any statements he made to police following his detention, arguing that the statements are the fruit of an unlawful search and seizure. Alternatively, Dorsey moves to suppress his statements on the ground that they were the result of a custodial interrogation without the benefit of Miranda warnings.

**A. Facts**

On December 19, 2009, Chicago's Office of Emergency Management and Communications received a 911 call reporting that a black male security guard in a liquor store was carrying a gun without a permit. The female caller said the security guard was wearing a black uniform with a gun on his waist. A recording of the call no longer exists.

At about 8:30 p.m., a dispatcher gave the following broadcast over the Chicago Police Department radio: "When you get rolling, can you, uh, check the guy who supposedly has a gun, security working at the store, who is not allowed to carry one, 6300 South Western." Chicago Police Officers Dorng and Hasenfang responded to the F&G Liquor and Food Mart, located at 6259 S. Western Ave.

There, according to the arrest report, the officers observed Dorsey, who was wearing a security badge around his neck. They approached Dorsey and asked him for identification and if he was an armed security officer. Dorsey responded that he was unarmed and said his identification was in the back of the store. At that point, according to the report, Dorsey "bladed" his right side away from the officers, which the Court interprets to mean that he turned that side of his body away from them. At the same time, Dorsey made what the arrest report describes as "awkward adjusting movement to the right side of his pants." Hasenfang and Dorng then

performed a pat-down search of Dorsey and recovered the handgun in his right rear pants pocket.

Up until this point in the encounter, the parties essentially agree as to the facts of what occurred.  However, Dorsey contends there are discrepancies in the police reports as to when Dorsey was read his Miranda warnings that necessitate the suppression of his statements.  Dorsey contends that the arrest report "unequivocally states" that Dorsey was advised of his rights at the scene, while the ATF reports state that he was not advised of his rights until after he was taken the police station.

Because of this inconsistency, Dorsey seeks suppression of any statements he made at the scene of the arrest or while enroute to the police station.  Further, Dorsey contends that even if he was read his rights at the police station, any statements he made should be suppressed because a Miranda violation cannot be cured by a second round of questioning following Miranda warnings.  Dorsey also seeks an evidentiary hearing on the Miranda issue to resolve what he contends is a factual dispute over when and where Dorsey was read his rights.  The Government responds that the reports are consistent, and that Dorsey has not raised a factual dispute entitling him to an evidentiary hearing.  The Court will save a detailed recitation of the facts underlying that claim for its analysis of that issue.

## II. ANALYSIS

"A defendant who seeks to suppress evidence bears the burden of making a prima facie showing of illegality." United States v. Randle, 966 F.2d 1209, 1212 (7th Cir. 1992). "Reliance on vague, conclusory allegations is insufficient." Id. In order to obtain a hearing on the motion, the proponent of a motion to suppress must show "definite, specific, detailed, and nonconjectural facts that justify relief." Id.

### A. Search and Seizure of Dorsey

Dorsey's Fourth Amendment suppression argument hinges on his claim that police subjected him to a Terry stop without reasonable suspicion, so all evidence seized as result of the stop must be suppressed. Under Terry v. Ohio, 392 U.S. 1, 24 (1968), an officer may conduct a brief investigatory stop without probable cause provided that the officer has a reasonable suspicion that the individual has or is about to commit a crime. Here, Defendant claims he was subjected to a Terry stop the moment Officers Dorng and Hasenfang approached him in the liquor store. Citing Florida v. J.L., 529 U.S. 266, 270 (2000), Dorsey argues the anonymous tip in this case was not sufficiently detailed to justify a Terry stop. The Government counters that there was no seizure until Defendant "bladed" his body away from the officers, a movement which, along with the other facts they knew, gave officers reasonable suspicion

to believe Dorsey was armed.  The key question, then, is when Defendant was seized for Fourth Amendment purposes.

The Supreme Court has noted that police questioning is a necessary tool for effective law enforcement, and not all encounters between citizens and police amount to seizures.  United States v. Mendenhall, 446 U.S. 544, 554 (1980).  A person has been "seized" for Fourth Amendment purposes only if, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  Id.  Circumstances indicating a seizure include the "threatening presence of several officers," the display of a weapon or physical touching of the suspect by police, or the use of threatening or intimidating language or tone of voice by the officers.  Id. at 554-55; see United States v. Childs, 277 F.3d 947, 950 (7th Cir. 2002) (noting that a seizure requires the use of physical force or the display of authority, not just the mere asking of questions).

Dorsey argues that a reasonable person would not have felt free to leave when approached by Hasenfang and Dorng because the two officers confronted him in a confined space.  The Government notes that the liquor store was open for business, and contends the officers merely approached Dorsey and asked him a couple questions.  That Dorsey felt free to leave is demonstrated by the fact that he told the officers his identification was in the back of the store

and turned his body as if to go retrieve it, the Government argues. The Court agrees with the Government.

Defendant relies primarily on two cases, United States v. Johnson, 427 F.3d 1053 (7th Cir. 2005) and United States v. Brown, 401 F.3d 588 (4th Cir. 2005). Both comparisons are inapt. In Johnson, police received an anonymous tip that the defendant possessed drugs. 427 F.3d at 1055. They went to his home to investigate, told the defendant about the anonymous tip, and asked to search the home. Id. The defendant, who had been standing at the front door, denied there were drugs in the home, then turned his back to police and retreated down a hallway. Id. A police officer responded by drawing his gun and telling the defendant that if proceeded down the hallway, it would be "an officer safety issue." Id. The defendant immediately stopped, and the court concluded he was seized at that moment. Id. at 1057. In the instant case, by contrast, there is no indication that Dorng and Hasenfang displayed their weapons or in any way tried to prevent Dorsey from walking away prior to the "blading action." And while the Johnson court relied in part on the fact that the defendant was in a confined space — the presumably narrow hallway — in this case Dorsey was in a public store that was open for business. Here, there is nothing to show that police restricted Dorsey's freedom of movement during the initial stages of their encounter with him. In

short, there is nothing to show that Dorsey was seized prior to the point in which he "bladed" away from the officers.

In Brown, the other case relied on by Dorsey, the defendant matched the description of an anonymous tip describing a man carrying a firearm outside an apartment complex. 401 F.3d at 590. As a police officer approached him, the defendant walked into an apartment, then quickly departed after the occupants of the apartment motioned for him to leave. Id. By that time, another police officer had arrived on the scene. Id. The officers questioned the defendant, and he told them he was not the man for whom they were looking. Id. at 590—91. The defendant refused to consent to a pat-down search. Id. at 591.

The officers noticed the smell of alcohol on the defendant's breath, and decided to arrest him for public intoxication. Id. One of the officers then told the defendant to put his hands on a nearby car. Id. When he bent over to do so, the officer noticed a gun-shaped bulge in the back pocket of his pants. Id. The officers then drew their weapons. Id. The Court held the defendant was seized, at the latest, when he submitted to the authority of police by putting his hands on the car. Id. at 595. Because the court found the police did not have probable cause to arrest the defendant for public intoxication or reasonable suspicion under Terry to stop him to investigate whether he

possessed a gun, the court suppressed the fruits of the arrest. Id. at 597—98.

Like in Brown, police here were responding to a general description of a man with a gun. But, again, the circumstances are distinguishable. In Brown, prior to the point where the defendant leaned over the car (and was seized) the officers had personally observed nothing that would lead them to believe he was carrying a weapon. Id. at 596. Here, by contrast, officers observed Dorsey turning his right side away from them and making what they described as "an awkward adjusting movement to the right side of his pants." This kind of movement may, along with other factors, justify a protective pat-down search. See United States v. Oglesby, 597 F.3d 891, 894—95 (7th Cir. 2010) (finding that the way suspect angled his body away from officers so that they could not see his right side was a factor justifying a search). While the anonymous tip was not enough on its own to justify a search, the officers were entitled to take it into account in deciding to frisk Dorsey. See United States v. Graham, 483 F.3d 431, 439 (6th Cir. 2007) (holding an anonymous tip coupled with furtive movements by suspect who appeared to reaching under the seat as police approached his vehicle justified frisk); Maldonado v. Pierri, 08 C 1954, 2010 WL 431478, at *6 (N.D. Ill. Feb. 1, 2010) (noting that anonymous tip was not meaningless merely because it did not provide reasonable suspicion for a Terry stop).

In sum, Dorsey was not seized until he "bladed" away from the officers. At that point, his suspicious movements, combined with the fact that Defendant matched the general description in the anonymous tip of a man working as a security guard at a store near 6300 S. Western Ave., gave Dorng and Hasenfang reasonable suspicion to frisk him. Therefore, his motion to suppress on Fourth Amendment grounds is denied.

### B. Questioning of Dorsey

Under Miranda v. Arizona, 384 U.S. 436, 444 (1966), police must advise suspects of their right against self-incrimination before they may engage in custodial interrogation. Here, Defendant argues that any statements Dorsey made at the liquor store or en route to the police station must be suppressed because of inconsistencies in the police reports as to when he was advised of his Miranda rights. Additionally, Defendant argues that even if the Court concludes that he was given his Miranda warnings at the police station, any statements he made there should be suppressed because a second round of warned questioning cannot cure a Miranda violation.

The facts relating to Dorsey's Miranda claim are as follows. The police department's event query log shows that Dorsey was in custody by 8:34 p.m. The narrative in the arrest report contains two references to Defendant being advised of his rights. First, after describing the frisk of Dorsey and the discovery of the gun,

the report reads, "[t]he subject was placed under arrest and advised of his rights." The report goes on to say that an investigation at the 8th District police station revealed Dorsey to have certain felony convictions, which are listed. The report then adds, "[a]fter being advised of his rights and stating that he understood them, the subject agreed to answer the [arresting officer's] questions. At 2045 hrs [8:45 p.m.] the subject was asked about the recovered handgun and replied, 'I took the gun from a guy that came in the store about a week ago and I thought I would just keep it.'"

On June 25, 2010, about six months after Dorsey's arrest, Hasenfang and Dorng were interviewed by an ATF agent. The June 28, 2010 ATF reports indicate that no discrepancies arose between the officers' recollection of the arrest and their initial arrest report. In the ATF reports, Officer Dorng stated that he gave Dorsey Miranda warnings prior to questioning him about the gun.

Supplemental ATF reports dated July 26, 2010 indicate that certain items were unintentionally left out of the June 28 reports. In the supplemental reports, Dorng stated that he ran Dorsey's criminal history while Dorsey was in the patrol car, and Dorsey responded that he had been in trouble when he was younger. After returning to the police station, Dorng advised Dorsey of his Miranda rights. Dorsey confirmed that he wanted to talk and told the officers that about a week prior to his arrest, he had wrestled

the gun away from someone and kept it.  Dorsey added that he knew he should not have had the gun, according to the report.

Hasenfang contributed the following information to the supplemental reports.  He recalled that while at the store, he asked an employee to see the store's business licenses.  After viewing the licenses, Hasenfang spoke with a store employee who told him Dorsey was a nice guy and that the employee had never seen him with a gun.  Hasenfang then had a discussion with Dorsey about his criminal history and gang membership.  Hasenfang recalled that Dorng read Dorsey his rights and that Dorsey admitted taking the gun from someone in the liquor store and keeping it.  Hasenfang's statement does not indicate when Dorsey was read his rights.

Here, there are three relevant time periods in which Dorsey made statements: (1) when police first approached him at the liquor store; (2) after his arrest but prior to his arrival at the police station; and (3) at the station.  As a preliminary matter, the Court agrees with the Government that any statements Dorsey made prior to the pat-down search should not be suppressed because Dorsey was not in custody at that point.  See United States v. Salyers, 160 F.3d 1152, 1159 (7th Cir. 1998) (holding that suspect was not subject to custodial interrogation where a reasonable person would have felt free to terminate the encounter).

The Government avers that it will not seek to introduce any statements Defendant made in the squad car en route to the station

about his criminal history.  As such, the only remaining question is the admissibility of Dorsey's admission to having taken the gun from someone in the liquor store and keeping it.

In arguing this statement should be suppressed, Defendant relies on Missouri v. Siebert, 542 U.S. 600, 606 (2004), in which the Supreme Court addressed the so-called "question first" interrogation practice.  This was a practice in which police would deliberately fail to warn suspects of their right against self-incrimination until after they had obtained confession, then read the suspects their rights and go through the process again to obtain a statement that complied with Miranda.  Id. at 605–06.  In analyzing the reasoning of Siebert, the Seventh Circuit has noted that the "question-first" practice thwarted Miranda because a suspect who has already confessed may well think it futile to refuse to repeat that incriminating statement after the warnings have been given.  United States v. Heron, 564 F.3d 879, 885 (7th Cir. 2009) (citing United States v. Stewart, 388 F.3d 1079, 1090 (7th Cir. 2004)).

As noted above, the initial arrest report makes two references to Dorsey being read his Miranda rights.  The first reference seems to indicate that he was read his rights at the scene because it appears in the report right after the description of the pat-down search.  The next reference seems to indicate Dorsey was read his rights at the police station because it appears after a discussion

of the investigation conducted there.  The supplemental reports reference Defendant having been read his Miranda rights at the police station, but not at the scene of the arrest.

Defendant's theory seems to be that the ambiguity in the police reports raises the possibility that made the statement regarding the gun at the scene upon his arrest, prior to the officers reading him the Miranda warnings.  If this is so, he reasons, then the statement should be suppressed, even if he later repeated it after having been read his rights.

In trying to raise a question of fact as to this point, Defendant contends that the police event query log shows that he must have made the statement regarding the gun at the scene.  The event query log indicates Defendant was arrested at 8:34 p.m., while another notation on the log indicates that the officers returned to the station at 9:11 p.m.  According to the arrest report, Dorsey confessed to possessing the gun at 8:45 p.m.  The Government responds that the F&G Liquor and Food Mart is only about 1.3 miles from the 8th District police station.  The time on the event query log, the Government contends, reflects the time the return to the station was reported to the dispatcher, not the time the officers and Dorsey actually arrived there.  As such, an interview at the 8th District police station could have taken place about 10 minutes after Defendant's arrest, the Government argues.

In Seibert, a plurality of the Supreme Court held that when Miranda warnings are given after an initial round of unwarned questioning, the court should look to the totality of circumstances to determine if the "midstream" Miranda warnings were effective. Seibert, 542 U.S. at 615. The factors to be considered include: (1) the completeness and detail of the questions and answers in the first round of interrogation; (2) the overlapping content of the two statements; (3) the timing and setting of the first and second statements; (4) the continuity of police personnel; and (5) the degree to which the interrogator's questions treated the second round as continuous with the first. Id. Justice Kennedy, concurring, reasoned that courts should suppress statements that are produced by a two-step interrogation technique designed to evade the Miranda requirement. Id. at 622.

The Seventh Circuit has not yet determined whether Justice Kennedy's test or the plurality's governs situations in which interrogations occur in two stages. Heron, 564 F.3d at 879. However, under either test, Dorsey has failed to present sufficiently detailed, non-conjectural allegations that his Miranda rights were violated to warrant an evidentiary hearing on this issue. Randle, 966 F.2d at 1212.

Nothing in the record suggests that the officers intended to elicit a confession by using a two-step interrogation technique so as to satisfy Justice Kennedy's test for suppression. Nor has

Dorsey raised a serious question that his confession should be suppressed under the plurality's multi-factor test. Initially, the Court notes that it is unclear whether Defendant was actually subjected to unwarned questioning at the scene or en route to the police station. Although the arrest report is ambiguous about when the Miranda warnings were given, that ambiguity actually cuts against Defendant, as the report suggests that he was read his rights both at the scene and at the police station. Nothing in the supplemental reports directly contradicts this.

However, assuming Defendant was subjected to unwarned questioning upon his arrest, the record does not indicate a thorough interrogation of him prior to arrival at the police station. The ATF supplemental reports indicate that Defendant made statements about his criminal history prior to his arrival at the police station, but the reports are consistent that Defendant's statements concerning the gun took place at the police station following Miranda warnings. Defendant's attempt to argue otherwise based on the event query log amounts to speculation.

As such, there is no indication that Dorsey's statements at the scene or in the squad car overlapped with his statements at the police station. In particular, there is no evidence in the record suggesting that Dorsey was twice questioned about the firearm. Although the two rounds of questioning were close in time and were conducted by the same officers, the questioning took place in

different locations — the squad car and the police station. Finally, there is no evidence Dorng and Hasenfang treated the two rounds of questioning as continuous. In short, in the absence of any indication that Dorsey confessed to possessing the handgun prior to being read the Miranda warnings, his suppression motion on Fifth Amendment grounds must fail.

### III. CONCLUSION

For the reasons stated herein, Defendant's Motion to Suppress is denied, as is his request for an evidentiary hearing on the Miranda issue.

**IT IS SO ORDERED.**

    Harry D. Leinenweber, Judge
    United States District Court

**DATE:**    May 5, 2011